*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RAUSS GREGORY BALL,

        Defendant-Appellant.

UNPUBLISHED
November 10, 2025
2:58 PM

No. 370437
Jackson Circuit Court
LC No. 2022-000456-FC

Before: LETICA, P.J., and M. J. KELLY and MARIANI, JJ.

PER CURIAM.

Defendant, Rauss Ball, appeals as of right his convictions following a jury trial of first-degree premediated murder, MCL 750.316(1)(a). Ball was sentenced as a fourth-offense habitual offender, MCL 769.12, to life without the possibility of parole. Because there are no errors warranting reversal, we affirm.

## I. BASIC FACTS

On February 27, 2022, Taylin Alexander went to a motorcycle club in Jackson, Michigan with his best friend. While there he was seen dancing, smiling, and enjoying himself. He was not drinking. Shortly after 3:00 a.m., he walked toward the back area of the club where the bathrooms were located. Ball, who was standing in that area with his back to the wall and his hands in his pockets, waited until Alexander came close to him and then viciously attacked him. The club's surveillance video shows him repeatedly striking Alexander, causing him to fall to the floor. Alexander managed to partially rise and grab Ball around his legs. Ball continued his onslaught by repeatedly striking Alexander. The momentum of the fight carried both men into a back area, which was not covered by a surveillance camera. A witness coming out of the bathroom, however, saw everything that happened. He described Alexander as clutching onto Ball in an effort to hold himself up. He described Ball as repeatedly stabbing Alexander with a knife. Other witnesses testified to Ball beating up Alexander up "pretty good." No witnesses saw Alexander fight back, nor did they see any type of weapon in his hands. When Alexander fell for a second time, he was able to get up and flee toward the front door. Witnesses testified that as he fled, Alexander said something like "he snuck me," "he struck me," or "he just poked me."

Alexander exited the club through the front door and was able to sit for a moment in the driver's seat of his vehicle before collapsing onto the ground. Witnesses described him as bleeding profusely, rolling around, groaning, and quickly losing the ability to articulate anything at all. Someone called 911. When the police arrived, they applied pressure to his stab wounds. Paramedics loaded him into an ambulance and worked to stabilize his pulse and help him breath en route to the hospital. At the hospital, he was classified as a severe trauma patient and an ATLS—advanced trauma life support—effort was promptly initiated. Ultimately, those efforts were unsuccessful and after approximately 45 minutes, he was pronounced dead.

Ball, on the other hand, was allowed to exit through the club's back door, which a club member unlocked for him. Ball testified that he threw the knife he had used in the stabbing away and travelled the two blocks to his house on foot. The knife was recovered, however, and forensic testimony confirmed that Alexander's blood and Ball's blood was on the knife. When Ball was arrested a few days later, he had a laceration on the pad of his thumb that needed medical treatment.

At trial, Ball's primary defense was self-defense. He testified that in November 2021, he had gone to get his rented vehicle's windows tinted, but had gotten into an argument with Savone Marizette, the man who was tinting the windows. Marizette, according to Ball, turned the altercation physical and, after they hit the side of the man's house while scuffling, two men came outside. Ball stated that one of the men was Alexander and that Alexander had pistol-whipped him with a gun multiple times before he was able to escape. He stated that the assault fractured his skull and presented medical testimony to support that fact. He claimed that, sometime later, Alexander fired a gun in the same direction as his vehicle when he was driving and that on another occasion Alexander followed him from a convenience store.

To refute that aspect of Ball's defense, the prosecution presented testimony from two witnesses to the November incident. Both testified that Alexander was not present and stated that the men that "jumped" Ball were Marizette's brother and brother-in-law. Text messages from Marizette to Ball referred to Ball's assailant as his "brother." Further, messages from Alexander's phone indicated that he was working at a different location on the day that Ball was assaulted. Finally, there was evidence that Alexander did not own or possess a gun and that he did not like guns.

Regardless, Ball insisted that Alexander was the man who attacked him. He testified that he had "asked around" and learned that Alexander was in a gang and was a mixed martial arts (MMA) fighter. He testified that he was scared when he saw Alexander. He claimed that he asked the club's president, its sergeant-at-arms, and another member to either make Alexander leave or to escort him from the club. He added that after seeing Alexander he immediately turned and placed himself against a wall where the cameras were so that if anything happened it would be caught on camera. The sergeant-at-arms, however, testified that no such request was made. Instead, he described Ball as "locked in" and "very focused" and Ashlee Lindemeyer, a former paramour of Ball's, testified that he did not seem scared when she approached him by the back wall.

Ball testified that Alexander looked at him 11 times before approaching. He stated that Alexander pulled up his pants and bounced around as if he were "geeking" himself up before approaching. He claimed that Alexander had "something" in his right hand. He said that

-2-

Alexander told him, "It's on sight, what's up?" Ball explained that, because of the fracture to his skull, he could not let himself be hit, so he struck first. He claimed that he attacked using his phone and his fists and that he knocked Alexander down. He testified that he then told Alexander, "I'm good," but that Alexander responded, "I'll kill your bitch ass" before rushing him and grabbing his legs. Ball testified that he dropped his phone during the portion of the fight that was not on camera and that the witness who had been in the bathroom area hit him in the head. Ball stated that he then drew his knife because he had to make sure that Alexander did not stab him or use his MMA skills to get him to the ground. He swung the knife until Alexander let go. Alexander then got up, and cut Ball with something. Ball added that Alexander told the man who had punched him that he was about to "pop this white boy." The witness who saw the portion of the fight in the off-camera area, however, denied hitting Ball and did not corroborate Ball's testimony regarding Alexander's threatening statements.

Ball's secondary defense was that Alexander's death was caused by an intervening cause: medical malpractice at the hospital. In support of that theory, he presented medical reports and questioned the emergency room physicians regarding what he believed to be documentation showing that Alexander was improving. He contended that the thoracotomy that was performed was, therefore, unnecessary and that it prevented the trauma team from finding and closing a wound on Alexander's back. The physicians, however, testified that Ball was misreading the reports and that any appearance of improvement was because of the hospital's life-saving efforts. They further explained that the thoracotomy was, in fact, necessary because Alexander presented with a penetrating wound to his chest and he had no pulse. They explained that in order to assess whether the damage could be repaired, they had to perform the procedure, which revealed that Alexander's heart was completely collapsed. They further explained that they could not have repaired the wound on Alexander's back because it would have required a procedure in the operating room, which could not be performed until he had a pulse established.

Following trial, the jury returned a verdict of guilty of first-degree murder. This appeal follows.

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

In a brief submitted by Ball's appellate lawyer, Ball argues that there was insufficient evidence to sustain his conviction because the prosecution did not disprove self-defense beyond a reasonable doubt. In a supplemental brief filed under Administrative Order 2004-6, Standard 4, Ball further argues that there was insufficient evidence to sustain his conviction because medical-malpractice was an intervening cause of death. Challenges to the sufficiency of the evidence are reviewed de novo. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). Due process requires that when the evidence is viewed in the light most favorable to the prosecution, a reasonable trier of fact could find each element of the crime established beyond a reasonable doubt. *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002). It is the trier of fact's role to judge credibility and weigh the evidence. *People v Jackson*, 292 Mich App 583, 587; 808 NW2d 541 (2011).

## B. ANALYSIS

In order to satisfy due process, the prosecution must prove every element of an offense beyond a reasonable doubt. *People v Smith*, 336 Mich App 297, 308; 970 NW2d 450 (2021). "The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bass*, 317 Mich App 241, 265-266; 893 NW2d 140 (2016) (quotation marks and citation omitted). "[T]o premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (quotation marks and citation omitted). Premeditation and deliberation may be inferred from the facts and circumstances. *Bass*, 317 Mich App at 266. "[M]inimal circumstantial evidence suffices to establish a defendant's state of mind." *People v Kenny*, 332 Mich App 394, 403; 956 NW2d 562 (2020).

Additionally, self-defense is applicable in murder cases. *People v Dupree*, 486 Mich 693, 709-710; 788 NW2d 399 (2010). Self-defense requires a finding that the defendant "acted intentionally, but that the circumstances justified his actions." *Id*. at 707. Section 1 of the Self-Defense Act, (SDA), MCL 780.971 *et seq*., provides:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.
>
> (b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of himself or herself or of another individual.

Once evidence of self-defense is introduced, the prosecution must disprove self-defense beyond a reasonable doubt. *Dupree*, 486 Mich at 709-710.

Here, Ball presented prima facie evidence of self-defense. He testified that he had been previously assaulted by Alexander, that he had a fracture to his skull, and that he believed that if he got hit in the head again he could die. Further, he testified that Alexander was at the club with "15 guys." He stated that Alexander looked at him 11 times, pulled up his pants, and bounced around like an MMA fighter before approaching with something in his hand. He also described Alexander as making multiple threatening comments, and he claimed that he only took the knife out when Alexander's confederate in the off-camera area hit him in the head.

The evidence, however, must be viewed in the light most favorable to the prosecution, not to the defense. *Lundy*, 467 Mich at 257. Viewed in the proper light, the record supports the jury's finding that the prosecution disproved self-defense beyond a reasonable doubt. At the outset, the prosecution presented documentary evidence and witness testimony disputing Ball's claim that Alexander violently assaulted him with a pistol in November 2021.

-4-

And, as detailed above, the surveillance footage allows for a reasonable inference that Ball's sudden, vicious assault of Alexander was unprovoked. That inference is corroborated by witness testimony describing Alexander as happy, smiling, and dancing. It is also corroborated by witness testimony describing Ball striking Alexander repeatedly with a knife while Alexander was unable to fight back and was holding on to Ball in order to keep himself upright. Ball's testimony that he was scared is contradicted by people who knew him, testifying that he did not seem scared, he seemed "locked in" and "focused." And, rather than rely upon Ball's testimony that he only drew the knife in the off-camera area after being punched by a witness, the jury was free to rely on testimony that he had the knife from the beginning of his assault and that Alexander was unarmed. Ball's testimony that he discarded the knife after the assault is corroborated because the police located the knife. And his testimony that Alexander had some sort of weapon was refuted by the fact that, unlike Ball, Alexander was searched for weapons when he entered the club.

Next, the prosecution presented other-acts evidence which refuted Ball's claim that he was afraid that if he got into a fight he could die as a result of his skull having been fractured in November 2021. Specifically, less than two weeks before the altercation at the club, Ball got into a fight with a man who was trying to repossess his vehicle. That man described Ball as first trying to get his vehicle off of the lift, pushing at him, and eventually punching him hard enough to break his glasses. Although Ball contested that version of events, the jury was free to credit the testimony from the other-acts witness.

Finally, Ball's overall credibility was weakened because the prosecution was able to present testimony showing how Ball's version of events kept morphing to better suit the evidence uncovered by the police. For instance, a club member sent Ball three text messages warning him that Alexander and another person were at the club and that they were talking about "jumping" him when he left. In jail calls, Ball recounted that when he saw the text messages, they made him more afraid of what was going to happen to him. However, at trial, a witness explained that Ball's phone revealed that the messages were sent *after* Ball had assaulted Alexander and *after* Ball had left the club. Then, contrary to his account of the messages during the jail calls, Ball suggested that he had not seen the messages until after the assault. Ball also stated in multiple jail calls that he did not have a knife that night or that, despite having a knife, he did not use it. At trial, however, after testimony indicating that a knife was recovered near the club with both his and Alexander's blood on it, he testified that he stabbed Alexander only at the end of the fight. He also stated that he *always* had a knife on him, which contradicted his jail-call statements that he did not have a knife that night.

Further, there was also sufficient evidence to refute Ball's claim that medical-malpractice was an intervening cause of death. As noted above, Ball questioned the emergency-room physicians regarding what he viewed as contradictions in the medical reports and what he viewed as unnecessary medical procedures that led to Alexander's death. The physicians testified that the procedures were necessary, that Ball was misreading the medical reports, and that certain parts of the report were simply incorrect. That evidence was sufficient to support the jury's finding that Ball, not medical malpractice, was the cause of Alexander's death.

In sum, viewing the evidence in the light most favorable to the prosecution, the prosecution presented sufficient evidence to prove beyond a reasonable doubt that Ball was not acting in self-defense and that Ball caused Alexander's death.

III.  WAIVER OF COUNSEL

A.  STANDARD OF REVIEW

Ball next argues that his waiver of counsel was invalid, resulting in the deprivation of his constitutional right to representation by a lawyer.  We review for clear error a trial court's factual findings related to a defendant's waiver of the right to counsel.  *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004).  "However, to the extent that a ruling involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *Id*.

B.  ANALYSIS

"The right to the assistance of counsel at all critical stages of criminal proceedings for an accused facing incarceration is protected by the Sixth Amendment, applicable to the states through the Fourteenth Amendment."  *King*, 512 Mich at 11 (citations omitted).  Likewise, the right to self-representation is protected by the United States Constitution, *id*., the Michigan Constitution, Const 1963, art 1, §§ 3, 20, and by statute, MCL 763.1.  "Choosing self-representation necessarily requires waiving the right to be represented by counsel."  *King*, 512 Mich at 11.  Nevertheless, there is no "absolute right to proceed to trial without counsel."  *People v Anderson*, 398 Mich 361, 366; 247 NW2d 857 (1976).  Rather, in order to exercise his or her right to self-representation, a defendant must first effectively waive his or her right to counsel.  *Id*. at 368.  "[W]ithout a valid waiver, a defendant *remains entitled* to the right to counsel for every critical stage of criminal proceedings."  *King*, 512 Mich at 14.

The question before this Court, therefore, is whether Ball effectively waived his right to counsel.  "Before granting a defendant's request to proceed *in propria persona*, a trial court must substantially comply[1] with the factors set forth in *Anderson*, 398 Mich at 367-368, and MCR 6.005(D) for a defendant to effectuate a valid waiver of the right to counsel."  *King*, 512 Mich at 11.  Under *Anderson*, when a defendant seeks to exercise the right of self-representation, "a court must determine that (1) the defendant's request is unequivocal, (2) the defendant is asserting his right knowingly, intelligently, and voluntarily through a colloquy advising the defendant of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business."  *Russell*, 471 Mich at 190.  See also *King*, 512 Mich at 11-12 (accord).  Furthermore, under MCR 6.005(D), a defendant may not waive his or her right to counsel until the court has (1) advised "the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation," and

---

[1] The substantial-compliance standard "protects the vital constitutional rights involved while avoiding the unjustified manipulation which can otherwise throw a real but unnecessary burden on the criminal justice system."  *People v Adkins (After Remand)*, 452 Mich 702, 727; 551 NW2d 108 (1996) (quotation marks and citation omitted), overruled in part on other grounds *People v Williams*, 470 Mich 634; 683 NW2d 597 (2004).

(2) offered "the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer."

## 1. INITIAL WAIVER

In this case, Ball did not originally seek to waive his right to counsel. He was first represented by a lawyer whom he retained, but discharged because he was apparently dissatisfied with the representation. His second lawyer was a public defender. Ball then retained a third lawyer, who determined that he had a conflict of interest because he was representing a key witness against Ball in a different matter.

Ball initially sought to waive his right to counsel during the withdrawal hearing for his third lawyer. On appeal, Ball argues that his statement that he "would have to be" ready to represent himself makes his request for self-representation equivocal. We disagree. Ball stated very clearly that he would "like to continue to proceed pro se." Later, he explained that the reason was because he did not trust the Public Defender's Office and could not afford to retain another lawyer. His rationale does not contradict his statement that he wanted to represent himself. Instead, it provided further support that he wanted to represent himself instead of being represented by a public defender.

Next, Ball suggests that the trial court erred by only minimally advising him of the risks of self-representation and by not trying to discourage Ball from representing himself. We again disagree. After Ball requested to proceed with self-representation, the trial court advised Ball of the risks associated with self-representation. Ball confirmed that he understood those risks. Further, Ball's lawyer indicated that he had also discussed the matter with Ball and had advised him to proceed with his request for self-representation with caution. A waiver is knowingly and intelligently given if the trial court makes "the pro se defendant aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *People v Dennany*, 445 Mich 412, 432; 519 NW2d 128 (1994) (quotation marks and citation omitted). Because Ball was advised of the risks of self-representation and confirmed that he understood those risks, his waiver of the right to counsel was knowing and intelligent. Although the court could have gone into greater detail on the risk associated with self-representation, the court's failure to do so does not mean that Ball's waiver was unknowing and unintelligent.

Next, Ball faults the court for failing to advise him of the maximum penalties for the charges he was facing. The court did not expressly tell Ball that he was facing the possibility of life imprisonment. However, the court advised that the charges were "as serious a charges [sic] as they get." Further, given that Ball's lawyer commented that the charges included "open murder," it defies logic to suggest that Ball was somehow oblivious to the fact that he had been charged with open murder. Regardless, "[t]he fact that the judge did not specifically address the charged offense and the range of possible punishment [at the initial waiver] is not enough to defeat a finding of substantial compliance with the waiver procedures . . . ." *People v Adkins (After Remand)*, 452 Mich 702, 721; 551 NW2d 108 (1996), overruled in part on other grounds *People v Williams*, 470 Mich 634; 683 NW2d 597 (2004).

Finally, the record reflects that Ball had discussed the matter with his lawyer prior to requesting that the court allow him to represent himself. Thus, although the court did not offer Ball an opportunity to consult with a lawyer before considering his request for self-representation, it is clear that Ball was, in fact, afforded such an opportunity and that he availed himself of it.

In consideration of the foregoing, we conclude that the trial court substantially complied with the requirements in *Anderson* and MCR 6.005(D). Consequently, Ball's initial waiver of counsel was valid.

## 2. SUBSEQUENT WAIVERS

Having concluded that the October 24, 2023 hearing resulted in a valid waiver of Ball's right to counsel, we must next consider Ball's argument that the trial court erred by failing to comply with MCR 6.005(E) at the subsequent proceedings. Unlike an initial waiver of the right to counsel, noncompliance with MCR 6.005(E) does not implicate a constitutional right and so it is "treated as any other trial error." *People v Lane*, 453 Mich 132, 139; 551 NW2d 382 (1996).

MCR 6.005(E) provides:

> If a defendant has waived the assistance of a lawyer, the record of each subsequent proceeding (e.g., preliminary examination, arraignment, proceedings leading to possible revocation of youthful trainee status, hearings, trial or sentencing) need show only that the court advised the defendant of the continuing right to a lawyer's assistance (at public expense if the defendant is indigent) and that the defendant waived that right. Before the court begins such proceedings,
>
> > (1) the defendant must reaffirm that a lawyer's assistance is not wanted; or
> >
> > (2) if the defendant requests a lawyer and is financially unable to retain one, the court must refer the defendant to the local indigent criminal defense system's appointing authority for the appointment of one; or
> >
> > (3) if the defendant wants to retain a lawyer and has the financial ability to do so, the court must allow the defendant a reasonable opportunity to retain one.
>
> The court may refuse to adjourn a proceeding for the appointment of counsel or allow a defendant to retain counsel if an adjournment would significantly prejudice the prosecution, and the defendant has not been reasonably diligent in seeking counsel.

Because the three requirements listed in the court rule are separated by the conjunctive "or" the trial court need not satisfy each requirement. Rather, it is apparent that requirements two and three need only be satisfied if the defendant requests a lawyer. See MCR 6.005(E). Additionally, the first sentence provides that the court must advise the defendant of his continuing right to a lawyer.

Assuming arguendo that the motion hearings held before trial constitute "proceedings" within the meaning of MCR 6.005(E), we conclude that the trial court substantially complied with the requirements in MCR 6.005(E) at the hearings subsequent to Ball's waiver of counsel.

-8-

The first hearing after Ball waived his right to counsel was on November 7, 2023. During that hearing, the trial court expressly addressed whether Ball continued to desire to represent himself. In doing so, it reaffirmed that Ball did not want the assistance of a lawyer. Because Ball did not state that he wanted a lawyer, the court had no obligation to satisfy the requirements in MCR 6.005(E)(2) or (E)(3). Additionally, although the court did not advise Ball that he had a continuing right to a lawyer's assistance, that right was implied given the conversations regarding the appointment of substitute standby counsel from a different county.

The second hearing occurred on December 8, 2023. At that time, the court asked Ball if he wished to continue to represent himself. Ball stated that he wanted to do so. Thus, the court fulfilled its obligation under MCR 6.005(E)(1). Further, Ball did not request representation by a lawyer during the hearing. Instead, he asked for his standby lawyer to be replaced by an "out of county" lawyer because he did not trust his standby lawyer. The court rejected that request. The court's rejection was not improper. See *People v Strickland*, 293 Mich App 393, 397; 810 NW2d 660 (2011) (stating that a defendant is not entitled to a lawyer of his or her choice "simply by requesting that the attorney originally appointed be replaced") (quotation marks and citation omitted). See also *People v Traylor*, 245 Mich App 460, 462; 628 NW2d 120 (2001) (indicating that substitute counsel is not warranted just because a defendant lacks confidence in his or her lawyer). And again, the references to the appointment of counsel for Ball constitute substantial compliance with the requirement that Ball be advised of his continuing right to the appointment of counsel.

Regardless, following the December 8, 2023 hearing, the prosecution filed a motion to clarify Ball's position regarding self-representation. That motion was expressly addressed at the next hearing, which was held on December 28, 2023. During that hearing, the court satisfied its obligation under MCR 6.005(E)(1) by asking Ball if he desired to continue to represent himself. Ball unequivocally stated that he wanted to represent himself. And, although he asked the court if his standby lawyer would be required to step in and represent him if he wanted, that was not a request for the appointment of counsel. Instead, it is clear that Ball's questions were aimed at clarifying future procedures. In response to Ball's request, the court made it clear that Ball continued to have the right to have his standby counsel assume representation of him should he be disruptive of the trial proceedings or should he need to step down. As such, the court substantially complied with the requirement that it advise Ball of his continued right to the assistance of a lawyer. Finally, the court was not required to comply with the requirements in MCR 6.005(E)(2) and (E)(3) because Ball did not ask for a lawyer to represent him.

The next proceeding was the trial, which took place over the course of nine days in January 2024. MCR 6.005(E) plainly applies to trials. Here, on the first day of trial, the court did not require Ball to reaffirm that a lawyer's assistance was not wanted, nor did the court expressly advise Ball that he had the continuing right to the appointment of a lawyer. Instead, before jury selection, the court indicated to the potential jurors that Ball was "representing himself" but that he had a lawyer "just to provide assistance." Notwithstanding the court's failure to confirm that Ball continued to desire to represent himself, the record reflects that, at the start of the trial, Ball did not want the assistance of a lawyer. Ball first confirmed that choice before opening statements, when he sought judicial clarification as to whether he could tell the jury the reason that he was representing himself. The court noted that "as long as you don't go on *ad nauseam* about it" Ball

-9-

could "absolutely" mention his rationale to the jury in his opening statement. Thereafter, during his opening, Ball stated:

> I just, as far as being my own representative, I paid someone $25,000.00. He later told me that I didn't pay him enough to listen to phone calls and watch the video so I fired him. The guy that told me I should probably fire him, I hired him and without me knowing he went to a different county. I hired another lawyer. I told him about a possible gross negligence from the hospital. He ended up withdrawing. So to be honest I felt like it was a sign from God that I needed to take my matter, matters into my own hands. I needed to represent myself.

> I, I have nothing to hide. I don't need to—this isn't [my standby lawyer's] murder trial. He doesn't need to get up here and talk to you guys for me. I need you to know—and this is the best way that you'll be able to see and talk to me and feel if you think that I'm telling you the truth. That's why I'm doing this. And it's my life.

Ball's statements make it clear that he had made the decision to represent himself. There is nothing in his statement indicating that he had chosen to do so because he was being forced or otherwise coerced into doing so. Rather, consistent with his representations at the hearings held prior to trial, Ball remained strident in his position that he wanted to represent himself because he did not trust anyone else to do so.

Additionally, on the fifth day of trial, the prosecutor raised the issue of the need for Ball to reaffirm that he continued to wish to represent himself. At that time, Ball indicated that he understood the charges and that "it carries a life offense." He again acknowledged the risks associated with representing himself and affirmed that he still wished to represent himself. Thereafter, he asked, "If at some point I, I choose to step down is that a possibility[?]" The court affirmed that he could absolutely do so whenever he wanted to do so and that all he had to do was "let me know."

Considered together, Ball's comments before his opening statement, during his opening statement, and on the fifth day of trial confirm that Ball continued to desire to represent himself during the trial. Further, the court's statements to Ball indicating that he could step down and that his standby lawyer would then be required to take over constitute substantial compliance with the requirement that the court advise Ball of his continued right to a lawyer's assistance. As such, the record does not support that the court's failure to comply with MCR 6.005(E) on the first day of trial prejudiced Ball. Reversal is, therefore, not warranted. See *Lane*, 453 Mich at 139 (stating that reversal is not required if the failure to comply with MCR 6.005(E) "could not have been decisive of the outcome.").

On appeal, Ball suggests that the court was obligated under MCR 6.005(E)(1) to reaffirm at the start of each day of trial that Ball desired to continue to represent himself. That argument, however, is contrary to the plain language of the court rule, which only indicates that a trial is a proceeding, not that each day of the trial is a proceeding. See MCR 6.005(E).

-10-

Ball's final argument relates to the sixth day of trial. Ball asked the court if it saw "what's going on" between himself and his standby lawyer. The court responded, "Yeah. You two are arguing." Ball then stated:

I've asked this man quite a few times *if* he wanted to take over the case and he says he will not do it. So once he's told me that four or five times why would I ever trust him to do it in the first place. Now he's talking about some conspiracy. I, I didn't say anything to him about a conspiracy.

I just said that *maybe* I'd want him to step in. I, in, *in case I wanted him to step in would you do it.* He said he will not represent me.

And so *even if you make him represent me* I do not trust this man. And it's been that way since I told you the first time. He hasn't helped me do anything. He doesn't tell me about objections. He doesn't help me get evidence in. Every question I ask him he says he doesn't even know. He's a 29 year vet. How does he not know about these logistical processes.

So tell me if I'm wrong, but that seems a little fishy to me.

I believe that he's speaking to, he's either sending messages or speaking to the prosecution considering what just happened yesterday.

And the people can say whatever they want on the record. They're not going to admit that they're committing a crime. That's just the way it is.

\* \* \*

So he won't help me do anything. (Emphasis added).

When asked if he had any comment, the prosecutor stated that "[t]he only concern from that that I gleaned was if defendant is now saying that he wishes to have someone represent himself I think we need to make a record." He asked, "Does he wish to represent himself or does he wish to have an attorney[?]" Ball answered, "That's unequivocal because I cannot trust anyone that has been appointed to me."

Ball went on to complain at length regarding the deficiencies he perceived his standby lawyer to have and added that "[t]his is the fourth lawyer that hasn't helped me do a thing." He explained:

That's the only reason I'm doing this. And I have to because this is my life.

And I just wanted to put, make a record of it that I am not getting any help from anyone in this situation but me. So do it as you may.

I want to represent myself because I cannot trust anybody here. I mean except you. I mean I've seen that you have been quite, you know, honest and, and

forthcoming and, and, and making sure that everything is done, you know, the right way. But nobody has helped me Your Honor.

The court permitted Ball's standby lawyer to make some comments regarding Ball's allegations. Ball's lawyer first asserted that he was not conspiring with the prosecution. He then stated that it was "true" that he "would not represent [Ball] because I could not ethically go forward with the defense he wants me to put on." Ball challenged that contention, noting that the defense related to his position that Alexander's death was caused by medical malpractice. Ball's standby lawyer maintained that Ball could present that defense, but that "as a lawyer" he could not present that defense. The court determined that it was not going to relieve Ball's standby lawyer of his duties. Ball then complained that his standby lawyer looked like he was "uninterested" in front of the jury because he was "not paying attention," was "not watching the videos," was "making facial gestures." The court found however, that Ball's standby lawyer was not "making faces." Ball continued by reiterating his complaints about his standby lawyer and then concluding that "obviously he does not want to help me. But that's fine and like you said, I just don't have to talk to him." He further stated, "And once again, as—as standby counsel if he was asked to represent me is, I was assume [sic] that it was his responsibility. I've asked him *just in case* numerous times and he said he will not do it. I told him we could take this—I told him I'll take the medical off the table. He still didn't want to do it." (Emphasis added). The court noted, however, that Ball's standby lawyer had stated that he could not represent Ball "with the defense that you want."

On appeal, Ball maintains that his defense was valid and points to the fact that the trial court instructed the jury on an intervening cause of death. Regardless, Ball maintains that the record shows that he was willing to take the medical defense "off the table" but that his lawyer was still unwilling to represent him. The record reflects that Ball did not state—even once—that he had asked his lawyer to step in and that his lawyer had refused. Instead, Ball made it clear that he repeatedly asked his standby lawyer *if* his lawyer would step in *if* he asked. And Ball did not state that he *would* take the medical defense off of the table. Instead, he explained that he had asked his lawyer whether he would represent him *if* he agreed to take the defense off the table. Ball's language regarding his standby lawyer taking over was, therefore, clearly referring to a hypothetical request rather than a genuine request that his lawyer take over his representation. Indeed, he stated with certainty that he would not trust his standby lawyer to take over his defense even if his standby lawyer were ordered to represent him. And he forcefully maintained that his desire to represent himself remained "unequivocal." As a result, it is clear that Ball desired to continue to represent himself. We, therefore, conclude that Ball was not deprived of his right to counsel for the remainder of his trial.

In summary, the trial court substantially complied with the requirements in *Anderson* and MCR 6.005(D) at the October 24, 2023 hearing. As a result, Ball's initial waiver of counsel was valid and he is not entitled to automatic reversal. Further, at each subsequent proceeding, the trial court substantially complied with MCR 6.005(E), and, to the extent that it did not, Ball has not established prejudice as a result of the court's failure. Finally, contrary to Ball's argument on appeal, his comments on the sixth day of trial did not render his request to represent himself ambiguous because he stated that he unequivocally wanted to represent himself in light of his extreme distrust of his standby lawyer.

## IV. JUDICIAL MISCONDUCT

### A. STANDARD OF REVIEW

In order to preserve a claim of judicial misconduct, the defendant must object on that basis in the trial court. *People v Sardy*, 216 Mich App 111, 117-118; 549 NW2d 23 (1996). During closing argument, Ball stated that the trial judge was "kind of showing" favoritism to the prosecution and stated that he wanted "to put that on the record." He has not alleged that the ruling that he objected to was an instance of judicial misconduct, however. Instead, all of his claims were not raised in the trial court and so none of them are preserved for appellate review. Unpreserved issues are reviewed for plain error affecting a defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To obtain relief on a plain-error review, the defendant must establish that an error occurred, that it was clear or obvious, and that it was prejudicial, i.e., that it affected the outcome of the lower court proceedings. *Id*. at 763. Reversal is not warranted unless the plain error caused an actually innocent defendant to be convicted or it "seriously affected the fairness, integrity, or public reputation of the proceedings." *Id*.

### B. ANALYSIS

"A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality." *People v Johnson*, 315 Mich App 163, 196; 889 NW2d 513 (2016) (quotation marks and quotation omitted). Our Supreme Court has explained:

> A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*People v Stevens*, 498 Mich 162, 164; 869 NW2d 233 (2015).]

On appeal, Ball points to a number of comments and conduct by the trial judge that he contends demonstrate that the judge was partial in favor of the prosecution. First, Ball contends that the judge committed misconduct by raising two "objections" for the prosecution. The first instance occurred near the end of the second day of trial:

> *Ball*. So now Dakota Adams—obviously if somebody is getting outside typically like what you've seen from your investigation and what you've been hearing through your investigation they're telling somebody to take something outside. Correct?

*The witness.* (No audible response)

*Ball.* To take it back to their car and typically you—

*The court.* That calls for speculation.

The second also occurred later during the same witness's testimony:

*Ball.* So at this point do you know if he's saying anything to me?

*The witness.* I do not know.

*Ball.* So that obviously you don't really know. Would he could possibly be saying something to me as he's walking toward me. Correct?

*The witness.* (No audible response)

*The court.* He's already said he doesn't know.

*Ball.* Okay. Okay sir.

Neither of the "objections" raised by the judge are indicative of judicial misconduct. The crux of the judge's statements was to stop Ball from asking a question that plainly called for speculation and to prevent Ball from repeatedly asking a witness the same question. The trial court is tasked with the duty "to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." MCL 768.29. Here, the judge fulfilled that task by briefly curtailing Ball's testimony twice during the course of a nine-day trial. In doing so, the judge did not belittle Ball or suggest that he was biased against Ball or that he favored the prosecution. As a result, the "objections" are not judicial misconduct.

Next Ball asserts that the judge helped the prosecution lay a foundation for a question. Ball had objected on the basis of speculation to a question, and the court responded, "Well just have him, number one, have him explain what, how the jail phone calls work. And then have him explain why he was drawing that conclusion." In doing so, the court implicitly sustained Ball's objection and told the prosecutor to rephrase his question. That the court gave specific suggestions for how to ask the question falls within the scope of the court's duty under MCL 768.29. Accordingly, it was not improper.

Ball also argues that it was judicial misconduct for the judge to release nine witnesses from their subpoenas without first asking Ball whether he had an objection. The judge did so on the second and third days of the trial. Thereafter, on the sixth day of trial and outside the presence of the jury, Ball raised an issue regarding the "new subpoenas that you told me I would need to fill out." The prosecutor indicated his belief that Ball was "referencing the subpoena for Dr. Michele Johnson and the other witnesses that were [excused]." Ball agreed, noting that he did not "remember . . . excusing anyone." The court responded, "Yeah, you did." The court added that Ball was asked and "had no objection to it and they were excused." Ball stated that he was "not asked . . . every time." The court responded:

Don't start with me what you did and didn't do. I remember very specifically asking you and you said you had no objection.

Ball then stated, "For certain ones. I understand."

With regard to the court's conduct in excusing nine witnesses from their subpoenas without first asking if Ball had an objection, the judge's conduct did not pierce the veil of judicial impartiality. For seven of the witnesses mentioned, Ball stated at the end of his cross-examination that he had no further questions, then the prosecutor asked that the witness be excused. The court then stated that the witness was "excused" without first asking if Ball had an objection. For one witness, Ball and the prosecutor stated that they had no further questions, so the court stated that they could "step down." The record then indicates that that witness was "excused," but no conversation occurred in relation to whether the witness was released from all subpoenas. Finally, one witness was nearly released, but was not after Ball stated that he wanted to recall him. There is nothing in the exchanges that indicate that the procedure used to dismiss the witnesses was anything other than routine. Moreover, the judge did not ask the prosecution or the defense if there were objections to excusing the above witnesses from their subpoenas. Instead, the matter was raised by the prosecution. On this record, it is not "reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." See *Stevens*, 498 Mich at 164.

Next, on the sixth day of trial, outside the presence of the jury, the trial court incorrectly stated that Ball had been asked and had not objected to the release of all the witnesses. "The fairness of trial and the process that is constitutionally due to a defendant are implicated when the jury is present and when they are excused." *People v Plomb*, Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 368608); slip op at 7. Thus, "[a] judge *can* pierce the veil of impartiality outside the presence of the jury at a jury trial." *Id*. at ; slip op at 1. In this case, however, the judge's incorrect statement did not reflect any improper bias against Ball. Indeed, other than being mistaken as to the circumstances involving the witnesses being excused, the judge accommodated Ball's requests to re-issue subpoenas to each witness that Ball sought to recall.

Ball similarly asserts that the court demonstrated its bias against Ball when it allowed Ball's standby lawyer to refuse to represent Ball because he felt that Ball's defense was "unethical." However, the court did not "allow" Ball's standby lawyer to refuse to represent him. Instead, as explained earlier, Ball represented to the court that he had asked "if" his lawyer would represent him, including whether he would do so *if* Ball took the medical defense off of the table. At no time during the exchange did Ball ask the court to direct that his standby lawyer represent him, nor did he indicate that he had done anything other than hypothetically ask his lawyer to represent him "four or five" times. Moreover, Ball's statements made it clear that he was not asking the court to direct his standby lawyer to represent him. Instead, he unequivocally wanted to continue representing himself and he continued to express extreme distrust of his standby lawyer. The fact that the court could have better clarified the willingness of Ball's standby lawyer to represent Ball is not judicial misconduct.

Ball also challenges the court's comment that it was "not true" that the prosecution and his standby lawyer were conspiring against him. Ball maintains that the judge could not know whether or not his allegations were or were not true. Yet, the court made the comment after the prosecutor

-15-

and Ball's standby lawyer placed on the record that they had not had any ex parte communications. The court is not demonstrating bias by crediting their representations instead of Ball's speculation that they might be conspiring against him.

Finally, during closing argument, the prosecutor objected to Ball's characterization of a witness's testimony. The judge instructed that the jury "can rely on their own memory." The following exchange then occurred between Ball and the trial judge:

> *The Defendant*. I didn't object one time when they were up here lying. So I don't understand. I'm not a lawyer. I get it. But you're, you're kind of showing them favoritism. I want to put that on the record.
>
> *The Court*. You can put that on the record.
>
> *The Defendant*. I appreciate it.
>
> *The Court*. I don't care what you think.
>
> *The Defendant*. Thank you.

This comment by the judge was improper. It is disdainful and communicates to the jury that the judge has a low opinion of Ball. Nevertheless, the trial in this case lasted 9 days, during which the judge exhibited professionalism and patience with Ball as he questioned witnesses, presented evidence, and made objections. The court's isolated comment does not demonstrate "a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *Jackson*, 292 Mich App at 598. Furthermore, the court instructed the jury that it could only decide the case based upon the evidence and that the court's "comments, rulings, questions and instructions" were not evidence. It is presumed that jurors follow their instructions, so any minimal prejudice to the defense arising from the court's single improper comment, was mitigated by the jury instructions. See *Stevens*, 498 Mich at 190 ("Because jurors are presumed to follow their instructions, the presence of a curative instruction does tend to cut against a finding of judicial bias.") (quotation marks and citation omitted).

On this record, we conclude that the single instance of judicial misconduct did not deprive Ball of his right to a fair trial.

## V. OTHER-ACTS EVIDENCE

### A. STANDARD OF REVIEW

Ball argues that the trial court abused its discretion by admitting other-acts evidence under MRE 404(b) because the evidence was irrelevant and was improper propensity evidence. Before trial, Ball challenged the other-acts evidence, arguing that it was inadmissible under MRE 609 and MRE 410. But he did not argue that it was inadmissible under MRE 404(b). Accordingly, this issue is unpreserved. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001) ("To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal."). We review Ball's

-16-

challenge, therefore, for plain error affecting Ball's substantial rights. See *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003).

## B. ANALYSIS

Ball first challenges the admission of other-acts evidence relating to a 2013 incident at an appliance store. However, Ball waived any challenge to the admission of the evidence by expressly stating that he had "no problem with" the admission of evidence related to this incident. Waiver is defined as "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). "It differs from forfeiture, which has been explained as 'the failure to make the timely assertion of a right.'" *Id*. Because a waived error is extinguished, there is nothing for this Court to review. *Id*. at 216.

Next, Ball argues that a February 15, 2022 incident was inadmissible under MRE 404(b). Benjamin Reed testified he arrived at Ball's residence to repossess Ball's vehicle. Reed testified that, as a courtesy, he informed Ball that he was taking the vehicle so that Ball could remove several car seats from it. He stated that Ball "lost his cool," came out of the house, and tried to get the vehicle off the lift. Ball put his hands on Reed, but Reed was able to fight back. Ball eventually punched him in the face hard enough to break his glasses. The police were called and Ball was charged in relation to the assault.

On appeal, Ball argues the evidence was inadmissible under MRE 404(b). Under MRE 404(b)(1), "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, under MRE 404(b)(2), "[i]f [the other-acts evidence] is material, the evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, absence of mistake, or lack of accident." In order to determine whether evidence is admissible under MRE 404(b), this Court considers the test established in *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). The *VanderVliet* test provides:

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury. [*Id*.]

The record reflects that the prosecutor asserted that there was a proper purpose for the evidence because it was admitted to rebut Ball's claim of self-defense. Ball's defense was that he had been struck in the head with a pistol by Alexander in November 2021. He stated that his skull was fractured as a result. Further, he testified to his belief that if he got hit in the head again, he could die. As a result, Ball asserted that he was in fear for his life when he was approached by Alexander at the club. In light of Ball's defense, the testimony regarding the repossession incident was relevant to disprove that defense. Evidence is relevant if "it has any tendency to make a fact [that is of consequence in determining the action] more or less probable than it would be without the evidence." MRE 401. Here, testimony that Ball initiated a fight with Reed less than two weeks earlier has a tendency to make it less probable that Ball was in fear of getting hit in the head and

dying should he have gotten into a fight with Alexander. And, given that the prosecution had the burden of disproving self-defense, Ball's state of mind at the time that he stabbed Alexander is a fact of consequence. The probative value of the evidence is significant inasmuch as it directly undercut Ball's theory that he was scared for his life as a result of the skull fracture he had sustained. That probative value was not substantially outweighed by the danger of unfair prejudice given that the jury was properly instructed on the use of the other-acts evidence and given that the prosecution primarily used the evidence to argue against his claim of self-defense.

Despite primarily using the evidence for a proper purpose, the prosecution did briefly argue that the incident helped to show that Ball was "someone who likes to have the last word, to get in the last word, the last punch, or in this case the last stab wound." In doing so, the prosecutor crossed the line and used the repossession incident for a forbidden propensity argument. Yet, Ball cannot show that, but for the prosecutor's brief, improper use of otherwise admissible evidence, that the outcome of the proceedings would have been different.

Indeed, even assuming arguendo that both the appliance-store incident and the repossession incident were inadmissible under MRE 404(b), Ball cannot show that he was prejudiced in light of the overwhelming evidence proving his guilt and disproving his claim of self-defense. Ball's attack was captured on video. It shows that when Alexander approached him, Ball initiated a vicious assault, stabbing him multiple times with a knife. Alexander did not even have an opportunity to fight back. Ball then fled out the back door and threw away the knife, which shows consciousness of guilt. The numerous stories that Ball gave are also indicative of consciousness of guilt. And, although he claimed that Alexander had assaulted him in November 2021, the prosecution presented evidence from the other witnesses present that Alexander was not there. Ball's testimony that he was in fear for his life was belied by his demeanor, which was described as locked in and not scared. He came to the club, armed with a knife made for stabbing, was not frisked, and stood, waiting in the back area until Alexander got close enough for him to strike.

Moreover, the other-acts evidence consisted of three witnesses over the course of a nine-day trial. Their testimony was not extensive, and the prosecution only relied briefly upon an improper inference from that testimony during rebuttal arguments. Finally, any prejudice to Ball was lessened by the jury instructions directing the jury on the proper use of the other-acts evidence. Jurors are presumed to follow the instructions given to them by the court. See *Stevens*, 498 Mich at 190.

## VI. SPEEDY TRIAL

### A. STANDARD OF REVIEW

In his supplemental brief, Ball argues that he was denied his right to a speedy trial. Whether a defendant was denied the right to a speedy trial is an issue of constitutional law that is reviewed de novo. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). The court's factual findings are reviewed for clear error. *Id*.

### B. ANALYSIS

Criminal defendants have a constitutional right to a speedy trial. US Const, Am VI, and Const 1963, art 1, § 20. "The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Williams*, 475 Mich at 261. "Whether an accused's right to a speedy trial is violated depends on consideration of four factors: (1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *People v Rivera*, 301 Mich App 188, 193; 835 NW2d 464 (2013) (quotation marks and citation omitted). "When the delay is more than 18 months, prejudice is presumed, and the prosecution must show that no injury occurred." *Id*. "[A] presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Williams*, 475 Mich at 262 (quotation marks and citation omitted).

Ball appears to have been arrested on February 28, 2022. His trial started on January 8, 2024. Thus, the length of the delay in this case is approximately 22 months. Because it is longer than 18 months, prejudice is presumed. One adjournment was at the behest of the trial court in order to accommodate a pre-planned vacation. Delays attributable to the court "are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *People v Gilmore*, 222 Mich App 442, 460; 564 NW2d 158 (1997) (quotation marks and citation omitted). Additional delay occurred because the defense sought five different adjournments. The court explained that "capital cases" go to the top of the list for scheduling and that, every time that the defense lawyer requested an adjournment, the court tried to "plug" Ball's trial in "at the next available date" given its severity. Thus, the record reflects that efforts were made by the court to minimize the delay caused by the defense. Regardless, none of the delays were attributed to the prosecution. Accordingly, the second factor weighs against a finding that Ball's right to a speedy trial was violated.

As to the third factor, Ball appears to have first asserted his right to a speedy trial in October 2023, which is approximately 19 months after his arrest. No additional delays occurred after he asserted his right. Thus, this factor also weighs against a finding of a speedy-trial violation.

Finally, Ball asserts that he was prejudiced by the delay. "There are two types of prejudice: prejudice to the person and prejudice to the defense." *Id*. at 462. On appeal, Ball contends that there was prejudice to his person because his younger brother died of an overdose, his best friend was shot and killed by police officers, and his 6-month-old nephew passed away. He maintains that his inability to support his family and loved ones during the grieving process caused him undue stress and anxiety. Further, he contends that, because of his incarceration, he lost his job, which placed a tremendous financial strain on his family. Additionally, he became depressed. However, such "general allegations of prejudice are insufficient to establish" that a defendant's right to a speedy trial was violated. *Id*.

Ball also asserts that there was prejudice to his defense because evidence was lost as a result of his first lawyer's "ineffective counsel." Specifically, he maintains that he was unable to call Bethanie Bennett and Justin Moran as witnesses, both of whom made statements that they did not see a weapon in Ball's hand and that they heard Alexander say something to Ball when he approached Ball. Further, he was unable to call Travaughn Soto. According to Ball, Soto had a "conversation" with Alexander's best friend after the incident. Yet, there is nothing on the record to support the contention that the inability to present testimony from Soto, Bennett, and Moran

-19-

was caused by the delay between Ball's arrest and the date of trial. And again, "general allegations of prejudice are insufficient to establish" that a defendant's right to a speedy trial was violated. *Id*.

Finally, Ball maintains that being incarcerated made it difficult for him to gather evidence, contact witnesses, and prepare a "viable defense" once he started representing himself. The prosecution, however, took extra steps to ensure that all evidence was turned over to the defense, and consideration of the entire trial record makes clear that Ball was able to use the evidence presented in order to prepare his defense. The fact that his defense was ultimately unsuccessful does not mean that it was not a "viable" defense.

Ultimately, although prejudice is presumed because of the length of the delay, in light of the fact that the majority of the delay is attributed to the defense, the fact that Ball did not assert his right to a speedy trial until around three months before the trial started, and the fact that he made only speculative and general assertions that the delay caused prejudice to his person and defense, we conclude that Ball's right to a speedy trial was not violated. Therefore, dismissal is not warranted.

## VII. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

In his supplemental brief, Ball also argues that the prosecutor committed misconduct. This issue is unpreserved because defendant did not contemporaneously object and request a curative instruction for the alleged prosecutorial misconduct. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010) ("In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction"). Unpreserved prosecutorial misconduct claims are reviewed for plain error affecting the defendant's substantial rights. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004).

### B. ANALYSIS

"[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "A prosecutor's knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment." *People v Loew*, 340 Mich App 100, 128; 985 NW2d 255 (2022) (quotation marks and citation omitted). In order to establish prosecutorial misconduct based upon the prosecutor's elicitation of false testimony, "a defendant must show two things—first, that a witness knowingly made a false statement, and second, that the prosecutor knowingly elicited the false statement." *Id*. Ball cannot do so.

Although it is not perfectly clear based upon Ball's brief, it appears that he is contending that the prosecutor presented false testimony from Detective Wheeler concerning the accuracy of the dance-floor video. During his testimony, Detective Jeremiah Wheeler stated that "we were screen recording these videos because there was no direct file to download from the cloud." Ball suggests that this was contradicted by Detective Michael Villarreal's testimony and a supplemental report that Detective Villarreal prepared. We disagree. Detective Villarreal testified that the video footage from the motorcycle club was "on the Cloud," so they had to log into the club's system in

order to view the video. He then explained that because the video was stored on the Cloud, they opted to view the videos on Detective Villarreal's phone and screen record them. That testimony corroborates Detective Wheeler's testimony. And, although Detective Villarreal's supplemental report indicates that he had a "file/video" stored on his hard drive, nothing in the report indicated that the file/video was a screen recording. Thus, the supplemental report does not prove that Detective Wheeler's testimony was false. Next, Ball asked Detective Villarreal to clarify what had happened to the "original" video, and Detective Villarreal explained that it had been stored on a portable hard drive and that the video was lost when the hard drive malfunctioned. Critically, there is nothing in the record indicating that the "original" video was not also a screen recording. Considering the foregoing, Ball has not proved that Detective Wheeler's testimony was false. Nor has he established that the prosecutor knowingly presented false testimony.

Next, to the extent that Ball is contending that the video was cropped or tampered with, Detective Villarreal testified repeatedly that it had not been tampered with. Detective Wheeler testified similarity. Ball's disagreement with this testimony does not make the testimony false, nor does it establish that the prosecutor knowingly presented false testimony.

Ball also suggests that Detective Villarreal admitted that he had "pieced" the video together. In support, he directs this Court to "body cam" footage taken from Detective Villareal's interview with a witness. When asked about the testimony, Detective Villarreal acknowledged that he had stated that the video was "pieced" together, but indicated that it was just a matter of semantics. Indeed, watching the interview, Detective Villarreal indicates that the initial video provided was "choppy" due to buffering as a result of the club's poor internet service but that the police had obtained a search warrant for additional footage to get the "complete, everything." He then noted that they "pieced it up more together." Based on our review of the video, it appears clear that he was referring to piecing together what events had transpired based upon the fuller video footage. In particular, he indicated that early statements from motorcycle club members had suggested that they did not know Ball, but that the video suggested that they were familiar with him. The video evidence, therefore, does not support a finding that the police witnesses testified falsely when denying Ball's insinuations that they had tampered with the evidence or that the prosecution knowingly presented false testimony.

Because Ball has not established that the witnesses testimony was false and that the prosecution knowingly presented false testimony, his claim of prosecutorial misconduct is without merit.

Ball next asserts that Reed's testimony was false because it was contradicted by the police report. The fact that a police report does not match a witness's testimony, however, is not proof that the testimony is false. It is just as likely that the police officer mistakenly recorded the information given by a witness.

Ball also contends that the prosecutor coerced two witnesses not to testify by threatening to charge them with crimes. Both witnesses, however, sought the advice of an attorney and stated that they intended to invoke their Fifth Amendment rights when questioned by the court. Although the prosecutor advised the court of the criminal liability that the witnesses faced, there is nothing in the record to indicate that he had threatened to pursue charges against either. Instead, after being

advised that the witnesses intended to plead the Fifth, the prosecutor merely informed the court of that fact so that the proper inquiries could be made outside the presence of the jury.

Finally, Ball argues that there were numerous other instances of prosecutorial misconduct on the second, third, fifth, sixth, seventh, eighth, and ninth days of the trial. He characterizes the instances that he identified as "foul blows." However, he provides no meaningful analysis of the claims other than to cite the actions he disagreed with and to claim that they were improper. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Given Ball's cursory treatment of the claims on his "list," we consider the "list" of prosecutorial misconduct claims to be abandoned.

## VIII. CUMULATIVE ERROR

Finally, Ball contends in his supplemental brief that reversal is warranted based upon the cumulative effect of the errors at his trial. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *Id*. In this case, there are two minor errors: first, the judge made a single improper remark in front of the jury, and second, the prosecutor briefly used otherwise admissible other-acts evidence to make a forbidden propensity argument. The prejudice arising from the errors, however, was minor given the limited nature of the improper comments. Moreover, that minor prejudice was alleviated by the instructions given to the jury regarding the use of judicial comments and of other-acts evidence. We conclude that the minor errors, taken together, did not deny Ball a fair trial and that reversal based upon their cumulative effect is not warranted. See *id*. at 107.

Affirmed.

/s/ Anica Letica
/s/ Michael J. Kelly
/s/ Philip P. Mariani